**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1513
_____

UNITED STATES OF AMERICA

v.

RAHMAN FULTON,
                              Appellant
_____

Appeal from the United States District Court for the District
of New Jersey (D.N.J. No. 2-13-cr-00261-001).
District Court Judge: Honorable Stanley R. Chesler
_____

Argued: February 29, 2016

Before: McKEE, *Chief Judge*, SMITH and HARDIMAN,
*Circuit Judge*s

(Filed: September 19, 2016)
_____

JOHN F. ROMANO, Assistant U.S. Attorney, ARGUED
Paul J. Fishman, United States Attorney
Mark E. Coyne, Esq.
970 Broad Street
Newark, New Jersey 07102
        *Counsel for Appellee*

LOUISE ARKEL, Research and Writing Specialist,
ARGUED
Carol Gillen, Assistant Federal Public Defender
K. Anthony Thomas, Assistant Federal Public Defender
1002 Broad Street
Newark, New Jersey 07102
        *Counsel for Appellant Rahman Fulton*

_____

OPINION OF THE COURT
_____

MCKEE, *Chief Judge*.

Rahman Fulton appeals his convictions for bank robbery and related offenses. He argues that the prosecution presented improper lay and expert witness testimony as well as misrepresented a key expert's testimony during its closing argument. Although we agree with Fulton that the district court improperly admitted certain testimony as lay witness testimony, we conclude that the error was harmless. We also conclude that the prosecution neither presented improper expert testimony nor misrepresented the testimony of its expert during its closing. Accordingly, we will affirm the district court's judgment of sentence.[1]

## I.

A. *The Robbery*

On May 25, 2012, a large man who appeared to be wearing multiple layers of clothing entered the PNC Bank in North Randolph, Pennsylvania carrying a gun.[2] He ordered everyone to the ground and demanded money from the tellers' second drawers.[3] Two PNC employees quickly handed him two stacks of cash, one of which contained a concealed Global Positioning System tracking device.[4] The robber's face was completely covered by a ski mask.[5] The

_____

[1] The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

[2] J.A. 51-55 (Robin Hunt, PNC Bank employee); 74-75, 78, 80 (Carol Viola, PNC Bank employee); 956-59 (Cynthia Womack, PNC Bank employee).

[3] J.A. 52 (Hunt), 957 (Womack).

[4] J.A. 52-53 (Hunt); 957-58 (Womack).

[5] J.A. 54 (Hunt testifying he wore "[f]ully covered mask, covered down [the] neck, had a s[w]eater on, like a dark-

robber's height was estimated as being anywhere from 6 feet to 6 foot 3 inches.[6] One employee described him as having a "medium build" and being "solid," but admitted she "couldn't really totally tell [if he was] muscular or not because the way [he] was covered."[7] She estimated his weight at 220 or 230 pounds.[8] Another employee described him as "a husky man, built" and "not necessarily fat but, you know, muscular."[9] She said it was hard to tell his build because of his bulky clothing.[10] The robbery occurred at 4:08 p.m., and lasted a matter of minutes.[11]

The GPS device hidden inside the stack of bills activated as soon as it was removed from the teller's drawer.[12] After the robber fled, the GPS device quickly led law enforcement officers to the neighboring town of Victory Gardens.[13] Within minutes, dozens of police officers swarmed the area.[14] The signals from the GPS then directed police to a building at 1 Jane Avenue.[15] When police arrived at that location, they discovered fragments of the GPS in the

---

colored sweater and like the mask and even had gloves on."); 959 (Womack describing the robber as "entirely covered in black clothing").

[6] J.A. 55 (Hunt estimating 6' to 6'3"); 80 (Viola estimating he was about 6'); 959 (Womack estimating 6' to 6'2").

[7] J.A. 55 (Hunt).

[8] J.A. 55 (Hunt).

[9] *Id.* at 80 (Viola).

[10] J.A. 80 (Viola).

[11] J.A. 98.

[12] J.A. 92 (Edward Farrington, PNC Bank employee); J.A. 614 (Lieutenant Stephen Wilson).

[13] J.A. 617 (Lieutenant Wilson).

[14] J.A. 408, 410 (Detective Thomas Laird) (testifying that approximately 20-25 police vehicles responded from neighboring towns); 746 ((Lieutenant Jeffrey Gomez)) (testifying that approximately 20-30 police vehicles responded).

[15] Pursuant to court policy, in this opinion we do not list the actual addresses involved in this case.  J.A. 502-03 (Sergeant Carl LeMarble); 618 (Lieutenant Wilson) (radio communications indicated the device "was signaling in the area of [1 Jane Avenue]").

backyard.[16] Based on the GPS data, the government's GPS expert testified at trial that the GPS was "disrupted"—likely smashed— between 4:18:37 and 4:18:53 p.m.[17] Police did not recover any fingerprints of evidentiary value on the fragments.[18]

Subsequent analysis of the GPS data led law enforcement to two suspects: Rahman Fulton and Ricardo Barnes. The GPS had signaled its location as 2-6 John Avenue immediately before it had been destroyed.[19] Fulton and Barnes lived in opposite halves of a house located at that address. Two John Avenue was owned by Michael Calcaterra, who rented a room to Fulton,[20] while the 6 John half belonged to Barnes' mother, with whom Barnes lived.[21] The figure below depicts Fulton, Barnes, and the Calcaterra's house and its relation to the 1 Jane Avenue backyard.

---

[16] J.A.764 (Lieutenant Gomez); 822 (Lieutenant Gomez); 455, 464-69 (Officer Kurt Edelman describing pieces).

[17] J.A. 313 (Expert Dr. Richard Andrew Fuller explaining that the sudden movement of the GPS device indicated in the GPS data at 4:18:37 can be explained by a sudden shock to the device, such as hitting the device against a rock); 1239 (GPS data displaying disruption).

[18] J.A. 831-32 (FBI Agent James Scartozzi).

[19] J.A. 293-94, 301-302.

[20] J.A. 165.

[21] J.A. 656.



2-6 John Avenue[22]

The thick black line in this figure encloses the two-family home where the Calcaterras, Fulton, and the Barnes lived. The dashed line down the middle demarcates the boundary between the two residences.

B. *Rahman Fulton*

At the time of the robbery, Rahman Fulton was employed as a sanitation worker for the Morris County Municipal Utilities Authority.[23] Despite this source of income, he was slightly behind on his rent payments[24] and owed his girlfriend some money.[25]

Officers first spoke to Fulton on the day of the robbery as they canvassed the Jane and John Avenue area after

---

[22] J.A. 1224, 1225, 1226, 166, 170-76 (Michael Calcaterra describing his half of the house), 942 (Michael Calcaterra's son describing the layout of his house).

[23] J.A. 524-25.

[24] J.A. 178 (Michael Calcaterra).

[25] J.A. 606 (Rosalyn Torres, Fulton's girlfriend at the time of the robbery).

locating the GPS.[26] By then, Officer Edelman had heard a report that someone fitting the description of the perpetrator lived at 2 John.[27] Following that lead, two officers went to 2 John at around 6:00 p.m. and saw Fulton sitting on the stairs.[28] When questioned about his whereabouts earlier that day, Fulton told them he had been at work.[29]

In a subsequent interview, however, Fulton admitted to the police that he had lied about being at work that day.[30] Instead, on the day of the robbery, Fulton had returned to 2 John in the morning after spending the night at his girlfriend's house.[31] He then called in sick to work and spent the rest of the day around the house.[32] At trial, Michael Calcaterra's son corroborated Fulton's story. He testified that Fulton came home that morning, went into his room, and then came out so the two could play video games together in the living room.[33] He further testified that after the games, Fulton returned to his room to watch TV and was home the rest of the day.[34]

At around 3:00 or 3:30 p.m.,[35] Michael Calcaterra returned home from work and spent 10-15 minutes in his house before he and his son went next door to cut their neighbor's lawn.[36] The neighbor, Keith Munro, lives on John

---

[26] J.A. 473 (Officer Edelman), 620-21 (Lieutenant Gomez).

[27] J.A. 481 (Officer Edelman).

[28] J.A. 620-21, 631 (Lieutenant Wilson).

[29] J.A. 622-23 (Lieutenant Wilson).

[30] J.A. 778-79 (Lieutenant Gomez).

[31] J.A. 593 (Torres).

[32] J.A. 526-27. The government points out that Fulton never provided his employer with a doctor's note for his absence from work, as company policy required. However, his failure to provide a doctor's note does not prove he was not sick. It only proves that he failed to comply with company policy. Similarly, the fact that he may have misrepresented that he was sick to his employer may show that he was not an exemplary employee, but it is hardly relevant to establishing that he is a bank robber.

[33] J.A. 938-41 (Michael Calcaterra's son).

[34] *Id.*

[35] J.A. 179 (Michael Calcaterra).

[36] J.A. 180-81 (Michael Calcaterra).

6

Avenue.[37] Michael testified that they likely started mowing at around 3:45 p.m.[38] When defense counsel asked Michael's son whether Fulton left the house while they were cutting the lawn, he replied, "No. He only sat on the porch," where he had gone out to smoke.[39]

At 4:19:12 p.m., as police were arriving in the John Avenue neighborhood and seconds after the GPS device was destroyed, Fulton made a 12-second phone call to his sister's girlfriend, Karina Echevarria.[40] Echevarria worked at a Kmart in the same shopping center as the PNC Bank.[41] Fulton occasionally picked Echevarria up from this Kmart and drove her to school.[42]

The government presented this call as a key piece of evidence in its case.[43] Eight months after the robbery, Echevarria testified before a grand jury[44] that:

> [Fulton] called me that day that the bank was robbed and he's like, oh, did you hear? And I'm like, yeah, no. I said no, that I didn't hear, and he told me, he's like, oh, you know, this happened, you know, Victory Gardens is blocked off, so, I'm like, oh, that's crazy.[45]

Because the police were just beginning to arrive in Fulton's neighborhood at the time he placed this call, the government argues that Echevarria's testimony was probative of his guilt.[46] According to the government, Fulton could not have known about the PNC robbery that occurred just 10 minutes prior to his phone conversation unless he was involved in the crime.

Fulton claimed that he did not call Echevarria to ask about the robbery. Instead, he suggested that she was the one

---

[37] J.A. 181 (Michael Calcaterra).
[38] J.A. 183 (Michael Calcaterra).
[39] *Id.* at 944-45 (Michael Calcaterra's son).
[40] J.A. 571 (Karina Echevarria).
[41] J.A. 564 (Karina Echevarria).
[42] J.A. 564, 570 (Karina Echevarria).
[43] Appellee's Br. at 31.
[44] Appellant's Br. at 17.
[45] *Id.* at 569 (Karina Echevarria).
[46] Appellee's Br. at 31.

who first told him about the robbery at the PNC Bank. At trial, the government confronted Echevarria with her grand jury testimony and asked her if she remembered who initiated the discussion of the bank robbery. She stated that she could not remember,[47] but she believed Fulton discussed the bank robbery with her during her 4:19:12 p.m. phone with him that day.[48]

After the initial call from Fulton to Echevarria, Echevarria called Fulton back at 4:25 p.m. That call lasted 50 seconds.[49] At trial, Echevarria testified that she called him back after she went outside to assess what was going on at the PNC Bank.[50]

Based on this information as well as the GPS data, police executed a search warrant at 2 John Avenue on July 5, 2012.[51] They did not find any traces of the GPS nor any other evidence during that search.[52]

C. *Ricardo Barnes*

Investigators first spoke to Ricardo Barnes on July 12, 2012, nearly a month and a half after the robbery.[53] Barnes told officers that he had been hanging out with a close friend, Nicola Gibbs, on the day of the robbery.[54] He testified at trial that he was in the Orange-Irvington area doing some shopping that day.[55] He also stated that Gibbs dropped him off at his mother's house on John in the early evening.[56]

Barnes was unemployed at the time of the robbery.[57] He was doing odd jobs and primarily living with his mother. He had been fired from bank-teller jobs at Bank of America

---

[47] J.A. 572 (Karina Echevarria).
[48] J.A. 576 (Karina Echevarria).
[49] J.A. 579 (Karina Echevarria).
[50] J.A. 578-79 (Karina Echevarria).
[51] J.A. 777 (Lieutenant Gomez).
[52] J.A. 778 (Lieutenant Gomez).
[53] J.A. 784.
[54] J.A. 670 (Ricardo Barnes).
[55] J.A. 671 (Ricardo Barnes).
[56] J.A. 673, 683-85 (Ricardo Barnes).
[57] J.A. 681 (Ricardo Barnes).

and Wells Fargo Bank.[58] He testified that neither Wells Fargo nor Bank of America places GPS tracking devices in the cash stacked in tellers' drawers.[59]

The table below summarizes the timing of the relevant events on May 25, 2012.

| Timeline of Events | | |
|---|---|---|
| 3:45 P.M. | Michael Calcaterra and his son begin to cut their neighbor's front lawn, and then proceed to cut the back lawn. | J.A. 183 (Michael Calcaterra) |
| 4:08 P.M. | Robbery occurs. By 4:08:59, the robber has left with the cash. | J.A. 1227-28 (stills from security footage) |
| 4:15 – 4:18 P.M. | Police start to arrive in Victory Gardens. | J.A. 454, 425 |
| 4:18:37 – 4:18:53 P.M. | The GPS device is likely destroyed. | J.A. 1239 (GPS data) |
| 4:19:44 P.M. | Fulton calls Echevarria for 22 seconds. | J.A. 571 (Echevarria) |
| 4:25 P.M. | Echevarria calls Fulton back. | J.A. 579 (Echevarria) |
| Slightly after 6:00 P.M. | Police speak to Fulton. | J.A. 620 (Lieutenant Stephen Wilson). |
| Sometime that afternoon / evening | Barnes returns home. | J.A. 683-85 (Ricardo Barnes) |

## II.

Fulton's trial began on January 14, 2014.[60] After hearing all of the evidence, a jury convicted Fulton of the bank robbery as well as use of a firearm in furtherance of a crime of violence.[61] He was subsequently sentenced to 57 months in prison for the robbery and 84 consecutive months for the firearm offense.[62] Fulton does not challenge this sentence on appeal. As noted at the outset, he bases his claims for relief on several of the district court's evidentiary rulings as well as statements the prosecution made during closing arguments.

A. *Lay Opinion Testimony Regarding Barnes' Cell Phone Usage*

---

[58] J.A. 652-56 (Ricardo Barnes).
[59] J.A. 666 (Ricardo Barnes).
[60] J.A. 25.
[61] J.A. 3.
[62] J.A. 4.

One of the principal reasons investigators eliminated Barnes as a suspect was that they believed he was on his phone when the robbery occurred. The government attempted to persuade the jury of this view through lay witness testimony from FBI Special Agent James Scartozzi. Agent Scartozzi testified that records of Barnes' phone calls established that he was on the phone when the robbery occurred. Since none of the witnesses testified that the robber spoke on a phone during the robbery, Scartozzi told the jury that Barnes could not be the robber.

Fulton now argues that such testimony was improper. Because defense counsel did not object to Scartozzi's lay opinion testimony at trial, we review for plain error.[63] We agree that the district court did err in allowing Scartozzi to offer a lay opinion that Barnes was on the phone at the time of the robbery. However, we conclude that this error was harmless and therefore does not entitle Fulton to any relief.

1.

Agent Scartozzi was the FBI case agent assigned to this crime. The government called him to testify as a summary witness, to provide the background of the investigation.[64] Fulton objected, arguing a summary witness was not necessary. Although the trial judge agreed that the need for such a witness was "underwhelm[ing],"[65] he nevertheless allowed Scartozzi to describe the investigation.[66]

In response to a line of questions regarding why he excluded Barnes as a suspect, Scartozzi testified that Barnes could not have committed the robbery because he was on the phone at the exact time it occurred. However, Barnes' cell phone records only establish that Barnes *received* an incoming call at the time of the robbery (4:08:44 p.m.).[67] The

---

[63] *See United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010); *see also United States v. Olano*, 507 U.S. 725, 731-32 (1993).

[64] J.A. 816.

[65] J.A. 818.

[66] J.A. 818.

[67] J.A. 1229.

records do not show whether the call was answered or went to voicemail. Yet, based on the mere fact that Barnes received a call, Scartozzi assumed that Barnes *took* the call and had a conversation.[68] He then concluded that Barnes could not have committed the robbery, and testified to that effect.[69] Scartozzi's conclusion was based solely on his assumption that "if [Barnes] had committed the bank robbery, [he] would have had to have been on the cell phone while he was doing that."[70]

Nevertheless, on cross-examination, defense counsel elicited a critical admission from Scartozzi: the call in question might have gone to voicemail.[71] Defense counsel also called its own investigator, Nicole Dreyer,[72] who testified that the 4:08:44 p.m. phone call *did* go to voicemail.[73] Thus, the jury clearly understood that the mere fact that Barnes *received* a call at 4:08:44 p.m. did not mean he *took* the call at that time. Dreyer's testimony was consistent with common sense.

Despite Dreyer's testimony that the call in question went to voicemail, Scartozzi continued to testify, on re-direct, that Barnes' cell records demonstrated he was not the perpetrator.[74] Indeed, Scartozzi stated that this evidence was one of the "most important[]" factors that led him to exclude Barnes as a suspect.[75] More specifically, when asked why he ruled Barnes out, Scartozzi replied: "There were several factors[,] . . . but, *most importantly*, his cell data showed that *he was on the phone during the bank robbery . . . .*"[76]

2.

---

[68] J.A. 842.

[69] J.A. 846 (Scartozzi, direct) ("[W]e had the fact that he was on a phone call during the time of the bank robbery . . . ."); 925 (Scartozzi, re-direct) ("[H]is cell data showed that he was on the phone during the bank robbery . . . .").

[70] *Id.* at 842 (Scartozzi, direct).

[71] J.A. 894 (Scartozzi, cross).

[72] J.A. 989 (Nicole Dreyer).

[73] J.A. 997 (Nicole Dreyer).

[74] J.A. 925 (Scartozzi, redirect).

[75] *Id.* at 925 (Scartozzi, redirect).

[76] *Id.* (Scartozzi, redirect).

11

Federal Rule of Evidence 701 permits a non-expert witness to offer her opinion to the jury if, and only if, her testimony is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[77] Such testimony is known as lay opinion testimony, and the proponent of the testimony bears the burden of providing an adequate foundation for that testimony.[78] If the testimony fails to meet any one of the three foundational requirements, it should not be admitted.[79]

In layman's terms, Rule 701 means that a witness is only permitted to give her opinion or interpretation of an event when she has some personal knowledge of that incident. The objective of such testimony is to put "'the trier of fact in possession of an accurate reproduction of the event.'"[80] In other words, "'lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'"[81] This rule recognizes the reality that "eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts."[82] Accordingly, it permits

---

[77] Fed. R. Evid. 701.

[78] *United States v. Freeman*, 730 F.3d 590, 595-96 (6th Cir. 2013); *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005); *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004).

[79] Fed. R. Evid. 701.

[80] *Freeman*, 730 F.3d at 595 (quoting Advisory Committee Notes to Fed. R. Evid. 701).

[81] *Id.* at 597 (quoting *United States v. Jayyousi*, 657 F.3d 1085, 1120 (11th Cir. 2011) (Barkett, J., concurring in part and dissenting in part)).

[82] *Garcia*, 413 F.3d at 211.

witnesses "to testify to their personal perceptions in the form of inferences or conclusory opinions."[83]

Importantly, the rule is carefully designed to exclude lay opinion testimony that "amounts to little more than choosing up sides, or that merely tells the jury what result to reach."[84] Courts have recognized that this Rule does represent "'a movement away from . . . courts' historically skeptical view of lay opinion evidence,' and is 'rooted in the modern trend away from fine distinctions between fact and opinion and toward greater admissibility.'"[85] Nonetheless, it seeks to protect against testimony that usurps the jury's role as fact finder. While opinion testimony that "embraces an ultimate issue"[86] to be decided by the trier of fact is not *per se* inadmissible, such testimony is barred when its primary value is to dictate a certain conclusion.[87] "[T]he purpose of the foundation requirements of the federal rules governing opinion evidence is to ensure that such testimony does not so usurp the fact-finding function of the jury."[88]

3.

Fulton's primary argument is that the district court should have excluded Scartozzi's testimony under the first prong of Rule 701, *i.e.*, Scartozzi's testimony was not "rationally based on [his] perception."[89] In response, the

---

[83] *Id.* (citing Advisory Committee Notes on 1972 Proposed Rules and on 2000 Amendments and 4 Weinstein's Federal Evidence § 701.03[4][b]).

[84] *United States v. Stadtmauer*, 620 F.3d 238, 262 (3d Cir. 2010) (internal quotation marks, citations, alterations omitted).

[85] *Id.* (alterations in original) (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1195 (3d Cir. 1995)).

[86] Fed. R. Evid. 704(a).

[87] *See* 4 Weinstein's Federal Evidence § 701.05 (noting that courts should be wary of opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations").

[88] *Garcia*, 413 F.3d at 210-11 (citing Fed. R. Evid. 704 and Advisory Committee Notes on 1972 Proposed Rules).

[89] Fed. R. Evid. 701(a).

government argues that Scartozzi rationally based his opinion that Barnes was on the phone during the robbery on Barnes' phone records.

Be these arguments as they may, we will focus on the second prong of Rule 701—the requirement that lay opinion testimony be "helpful to clearly understanding the witness's testimony or to determining a fact in issue"[90]—since it is dispositive. Scartozzi's opinion regarding whether Barnes was on the phone was simply not helpful. In fact, it was the antithesis of helpful—it was dead wrong and even misleading. An opinion only qualifies as helpful "if it aids or clarifies an issue that the jury would not otherwise be as competent to understand."[91] Thus, where a witness is not in a better position than the jurors to form an opinion or make an inference, the witness's opinion is inadmissible under Rule 701(b).

We have consistently excluded testimony that meets the "rationally based" prong because it is insufficiently "helpful to the jury." For example, in *United States v. Dicker*,[92] our court excluded an agent's testimony that interpreted an uncomplicated conversation for the jury. The district court had admitted the testimony, reasoning that "'the conversations were truncated sentences, sentence fragments and incomplete thoughts,'" which relied on "'code words.'"[93] We reversed on appeal, explaining that the recorded conversation was "perfectly clear" without the agent's "interpretations,"[94] and the jury should have "been allowed to draw its own conclusions regarding" the recording.[95]

Similarly, in *United States v. Anderskow*,[96] we held that a witness's lay opinion was inadmissible under Rule 701(b) because the jurors themselves could have just as easily interpreted the evidence on which the witness opined. In that

---

[90] Fed. R. Evid. 701.

[91] *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 600 (3d Cir. 1998).

[92] 853 F.2d 1103, 1108 (3d Cir. 1988).

[93] *Id.* (citing district court opinion below).

[94] *Id.* at 1110 (internal quotation marks omitted).

[95] *Id.*; *see United States v. Hoffecker*, 530 F.3d 137, 170-71 (3d Cir. 2008) (quoting this language).

[96] 88 F.3d 245, 250-51 (3d Cir. 1996).

case, a cooperating conspirator in a loan fraud conspiracy testified that he provided one of the defendants, Donald Anchors, with fraudulent documents to be passed along to borrowers.[97] On direct examination, the government asked the cooperating conspirator whether Anchors would have been "deceived by the information that [the witness was] sending him."[98] The witness responded: "I had no reason to believe that he wasn't fully aware of what was occurring, as long as he was getting paid."[99] We held that this testimony was inadmissible under Rule 701(b): "We do not understand how a witness' subjective belief that a defendant 'must have known' [of the object of a conspiracy] is helpful to a factfinder that has before it the very circumstantial evidence upon which the subjective opinion is based."[100] "Stated another way, the witness's testimony was not helpful—and thus inadmissible under Rule 701—because the jury was in just as good a position as the witness to infer what Anchors 'must have known.'"[101] As we further pointed out, the government was free during closing to ask the jury to draw the inference the witness had drawn. But Rule 701(b) prohibited the government from calling a witness to offer this inference through opinion testimony.[102]

As the court of appeals for the First Circuit has explained, the "nub" of Rule 701(b)'s requirement is "to exclude testimony where the witness is no better suited than the jury to make the judgment at issue."[103] Accordingly, in *United States v. Meises*, the First Circuit ruled that where the jury had an opportunity to listen to all the same recordings as the testifying case agent, that agent's testimony was inadmissible under 701(b) because he had no "insight to offer the jurors."[104] The agent "inferred [the defendant's] roles not

---

[97] *Id.* at 249.

[98] *Id.*

[99] *Id.* at 250.

[100] *Id.* at 251.

[101] *United States v. Stadtmauer*, 620 F.3d 238, 265 (3d Cir. 2010) (characterizing *Anderskow*'s holding as such).

[102] *Anderskow*, 88 F.3d at 251.

[103] *United States v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011) (internal quotation marks omitted).

[104] *Id.*

15

from any direct knowledge, but from the same circumstantial evidence that was before the jury—effectively usurping the jury's role as fact-finder."[105] Again, while, "[i]t was perfectly appropriate for the prosecutor to argue in summation that the [relevant] evidence . . . supported the inference that they were the buyers," the case agent's testimony amounted "to simply dressing up argument as evidence."[106] Thus, where a case agent's testimony leaves the jury "to trust that [the case agent] had some information—information unknown to them—that made him better situated to interpret the words used in the calls than they were,"[107] when, in fact, he does not, such testimony is inadmissible under Rule 701(b).[108]

Scartozzi's interpretation of Barnes' phone records as a lay witness did exactly what the body of case law interpreting Rule 701(b) prohibits. Nothing about Barnes' phone records was unclear, coded, or in need of interpretation. Instead, Scartozzi's interpretation of Barnes' phone record presents a quintessential example of "where the witness is no better suited than the jury to make the judgment at issue."[109] The "value" of Scartozzi's testimony regarding the phone records was to "tell the jury what result to reach."[110]

The government claims that Scartozzi's testimony helped the jury assess whether Scartozzi prematurely excluded Barnes as a suspect. But Scartozzi's opinion testimony did more than just shed light on the thoroughness (or lack thereof) of Scartozzi's investigation. Scartozzi's

---

[105] *Id.*

[106] *Id.* at 16-17.

[107] *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

[108] *See id.* at 597-98; *United States v. Hampton*, 718 F.3d 978, 982-83 (D.C. Cir. 2013); *Meises*, 645 F.3d at 16-17; *United States v. Johnson*, 617 F.3d 286, 292-93 (4th Cir. 2010); *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir. 2007); *United States v. Garcia*, 413 F.3d 201, 213-14 (2d Cir. 2005); *United States v. Grinage*, 390 F.3d 746, 750-51 (2d Cir. 2004).

[109] *Meises*, 645 F.3d at 16 (internal quotation marks omitted).

[110] *Garcia*, 413 F.3d at 210 (internal quotation marks omitted).

testimony provided a definitive interpretation of a crucial disputed fact—whether Barnes could have committed the robbery. Had Scartozzi testified that he excluded Barnes as a suspect because he *assumed* Barnes was on the phone, such testimony might have been helpful to determining why Scartozzi excluded Barnes as a suspect. However, Scartozzi did not frame his testimony this way. Instead, he stated that Barnes could not have committed the robbery because he "would have had to have been on the cell phone while he was doing that."[111] Such testimony usurped the jury's role as fact finder.

Accordingly, Scartozzi's testimony regarding whether Barnes could have committed the robbery due to the phone call he received does not meet Rule 701(b)'s helpfulness requirement. Because we conclude that Scartozzi's lay testimony failed this second prong, we need not address the other two prongs of the Rule 701 test.

4.

Despite the district court's error in admitting Scartozzi's testimony, we cannot reverse unless we find that this error was plain.[112] To demonstrate plain error, an appellant must establish "that (1) there is an 'error'; (2) the error is 'clear or obvious, . . .'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"[113]

Allowing Scartozzi's testimony was an error that was clear and obvious as required under the first and second prongs of the harmless error test. Nevertheless, we conclude that Fulton has failed to show that the error affected his

---

[111] J.A. 842 (Scartozzi, direct).

[112] Because defense counsel did not object to Scartozzi's lay opinion testimony at trial, we review for plain error. *See United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010); *see also United States v. Olano*, 507 U.S. 725, 731-32 (1993).

[113] *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

substantial rights and seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

Despite Scartozzi's dogged persistence in testifying that he eliminated Barnes because of the incoming phone call, defense counsel was able to solicit a concession from Scartozzi that the call in question could have gone to voicemail. This admission helped establish that Barnes was not necessarily on the phone at the time of the robbery. It exposed Scartozzi's statement as a mere opinion, and an incorrect one at that. More importantly, Fulton's investigator testified that the call in question did actually go to voicemail. Therefore, Fulton presented persuasive evidence that Barnes was not, in fact, on the phone at the time of the robbery. At the very least, defense counsel showed that Barnes should not have been excluded as a suspect merely because he received a call at 4:08 p.m. Accordingly, we cannot conclude that Scartozzi's improper testimony affected the outcome of the district court proceedings.

Moreover, at trial, the government presented unrebutted expert testimony interpreting Barnes' cell phone data and concluding that his phone was most likely *not* at the PNC Bank at the time of the robbery. An FBI agent testified that Barnes' cell data suggested his phone was probably not within 1,000 feet of the PNC Bank.[114] This testimony mitigates the likelihood that Scartozzi's testimony affected the outcome of the proceedings. Even without Scartozzi's statement that Barnes was on his phone, the government still had evidence that Barnes' phone (and therefore, likely, Barnes) was not at the PNC Bank during the robbery.[115]

Fulton's contention that Scartozzi's testimony seriously affected the fairness, integrity, or public reputation of the judicial proceedings is just as weak. Although Scartozzi did persist in testifying on re-direct that part of the reason he excluded Barnes was because he received the 4:08 p.m. call, the government did not rely on this testimony during closing. In fact, at closing, the government did not

---

[114] J.A. 729-31.

[115] *See United States v. Stadtmauer*, 620 F.3d 238, 266 (3d Cir. 2010) (holding that a Rule 701 error was harmless because the record as a whole suggested the conclusion the inadmissible evidence offered).

even mention Barnes' phone call. Instead, "in urging a guilty verdict, the prosecution focused the jury's attention only on the extensive admissible evidence supporting that result."[116] Under these circumstances, we hold that the district court's error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. Accordingly, we hold that the district court's error was not plain. Thus, Fulton is not entitled to relief because of the erroneous admission of lay opinion testimony regarding Barnes' phone call.

B. *Lay and Expert Testimony on the Appearances of Barnes and Fulton*

Fulton claims that Scartozzi and another officer, Lieutenant Jeffrey Gomez, offered improper lay opinion testimony about the comparative appearances of Barnes, Fulton, and the person depicted in the surveillance video, in violation of Federal Rule of Evidence 701. Fulton also argues that Gomez improperly presented expert testimony in violation of Federal Rule of Evidence 702. Because defense counsel did not object to Gomez and Scartozzi's statements at trial, our review of these issues is for plain error.[117] We again agree with Fulton that the district court erred in admitting the agents' testimony regarding the comparative appearances of Barnes and Fulton. However, we once again conclude that the error was harmless. Furthermore, we disagree with Fulton's challenge to Gomez's testimony under Rule 702.

1.

A surveillance video captured footage of the robber demanding and receiving money from the bank tellers, and then leaving the bank. At trial, the government offered the testimony of Agent Scartozzi as well as another investigating

---

[116] *United States v. Garcia*, 413 F.3d 201, 217 (2d Cir. 2005) (finding a Rule 701 error to be harmless, in part, because the government "never referenced it again throughout the case . . . much less ma[d]e improper use of [the] challenged opinion in summation").

[117] *See Christie*, 624 F.3d at 567; *see also Olano*, 507 U.S. at 731-32.

officer, Lieutenant Jeffrey Gomez. They both offered their opinions about whether Fulton or Barnes' appearance better matched the robber in the surveillance video. Gomez testified that he watched the bank surveillance video and concluded that the suspect "was a very muscular male" and that "[g]iven the pictures, the height of the counters and stuff, he was six foot, maybe just over six foot tall."[118] Gomez also testified that he had personal knowledge of the PNC Bank at issue because he does his banking at that branch.[119] Reviewing a still from the surveillance video,[120] Gomez stated, "you can see the left arm, the bicep, you can see the definition, the contrast on the light-colored floor in the back, as well as the height of what I'll refer to as the, I guess the cabinets in the middle."[121] Reviewing another surveillance video still,[122] which depicts the robber leaning over the bank counter, Gomez testified: "Once again, referring to the height, I'm about five foot eight, and standing at this counter here, I would not have the ability to lean over this counter . . . the way that the bank robber is in this picture."[123] Thus, Gomez concluded, "[t]hat leads me to believe that he's at least six-foot tall, maybe just over six-foot tall."[124] Regarding the suspect's build, Gomez stated, "you look at the contrast of the light floor in the background and the arm here, as well as the shoulder, you can see that he has a muscular definition to him."[125] He added, "with reference to the clothing, you can see the outer garment in this picture, it's too big for him."[126]

Gomez also testified that when he met Barnes for the first time two months after the robbery, he concluded "immediately"[127] that Barnes could not be the person in the surveillance video. He explained that Barnes "was a very,

---

[118] J.A. 769.

[119] J.A. 769.

[120] *Id.* at 1232.

[121] *Id.* at 769.

[122] *Id.* at 1220.

[123] *Id.* at 771.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Id.* at 785.

20

very large male, over 300 pounds."[128] After reviewing a photo of Barnes at trial,[129] Gomez said "Mr. Barnes lacked the muscular build that the bank robber had. You look at his mid-section here, the front view, at that time [Barnes] had a very, very large belly."[130] Estimating that Barnes weighed over 300 pounds, Gomez concluded that Barnes was "[s]ignificantly heavier than the bank robber."[131]

Scartozzi testified that he also excluded Barnes based on comparisons of photographs of Barnes[132] with the surveillance video. He explained that the man in the surveillance video "looks fit, muscular, has an athletic build, and that's denoted basically by their basic shape. Athletic build means that your waist is slimmer than your chest area."[133] When questioned about his physical observations of Barnes, he testified, "[a]lthough he's a large African American male, his height is similar to that of the bank robber, his physical – his physique does not match in that he is not athletic, meaning his waist size is actually bigger than his chest size."[134] Based on his comparison of photos of Barnes to the surveillance footage, Scartozzi concluded that Barnes "did not match the physical descriptors of the bank robbery."[135] Scartozzi met Barnes for the first time at trial.[136]

At one point during Scartozzi's testimony, while Scartozzi was explaining why he excluded other individuals as suspects, the trial judge warned the government against eliciting "any opinion about whether or not the defendant is the person who committed the bank robbery."[137] The judge cautioned, "he's at best giving something vaguely resembling lay opinion testimony right now. . . . [H]e cannot give any

---

[128] *Id.*

[129] *Id.* at 1231.

[130] *Id.* at 787.

[131] *Id.*

[132] J.A. 836 (reviewing Gov. Exh. 411, at J.A. 1231).

[133] *Id.* at 822.

[134] *Id.* at 836-37.

[135] *Id.* at 838.

[136] *Id.* at 902.

[137] *Id.* at 849.

opinion testimony in any way, shape or form of the ultimate issue in this case."[138]

*Despite this warning*, the government elicited testimony from Scartozzi comparing photos of Fulton with the surveillance stills.[139] Scartozzi described the photos of Fulton as depicting a "[v]ery athletic and thin" person with a "'V' shape to his body."[140] "He's a very well developed individual as far as musculature," with a "thin waist and wide upper body."[141] He concluded, based on his physical comparison of the bank robber and Mr. Fulton, that "Mr. Fulton's body type and muscularity was similar to that of the person depicted in the PNC Bank surveillance video."[142]

2.

Fulton argues that Scartozzi and Gomez's testimony meets neither the first nor second requirement of Rule 701: that the testimony be rationally based on the witness's perception and be helpful to the jury. We address the second issue first.

This testimony fails Rule 701(b)'s helpfulness requirement. As previously explained, an opinion only qualifies as helpful "if it aids or clarifies an issue that the jury *would not otherwise be as competent to understand*."[143] Lay opinion testimony that aids in the identification of suspects "is particularly valuable where . . . the lay witnesses are able to make the challenged identifications based on their familiarity with characteristics of the defendant *not immediately observable by the jury at trial*."[144] In other words, "lay witness testimony is permissible where the witness has had sufficient contact with the defendant to

---

[138] *Id.* at 850.

[139] J.A. 852-56 (reviewing Gov. Exhs. 394, 394A and 392, at App. 1233, 1234, 1235).

[140] *Id.* at 853.

[141] *Id.* at 853-54.

[142] *Id.* at 856.

[143] *Lauria v. Nat'l RR Passenger Corp.*, 145 F.3d 593, 600 (3d Cir. 1998) (emphasis added).

[144] *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir. 1986) (emphasis added).

achieve a level of familiarity that renders the lay opinion helpful."[145] As the court of appeals for the Ninth Circuit has held, whether

> lay opinion is helpful depends on a totality of the circumstances including the witness's "[f]amiliarity with the defendant's appearance at the time the crime was committed," the witness's familiarity with the defendant's customary manner of dress, insofar as such information related to the clothing of the person depicted in the surveillance photograph, whether the defendant disguised his or her appearance during the offense or altered his or her appearance before trial, and whether the witness knew the defendant over time and in a variety of circumstances, such that the witness's lay identification testimony offered to the jury "a perspective it could not acquire in its limited exposure" to the defendant.[146]

This recognizes that the more familiar a witness is with a suspect's appearance, the more useful her identification testimony is to the jury. At least in theory, a witness who is intimately familiar with a defendant's appearance can perceive similarities and differences that jurors might not notice. In short, the witness may be in a better position than the jurors to make the identification from the relevant evidence.

For example, in *United States v. Jackman*,[147] the First Circuit held that lay witness opinions regarding the identity of

---

[145] *United States v. Beck*, 418 F.3d 1008, 1014 (9th Cir. 2005) (internal quotation marks omitted).

[146] *Id.* at 1015 (alterations in original) (quoting *United States v. Jackman*, 48 F.3d 1, 5 (1st Cir. 1995), *United States v. Pierce*, 136 F.3d 770, 774, 775 (11th Cir. 1998), *United States v. Allen*, 787 F.2d 933, 936 (4th Cir. 1986) *cert. granted, judgment vacated on other grounds*, 479 U.S. 1077 (1987)); *see also Jackman*, 48 F.3d at 4-5; *United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990); *United States v. Farnsworth*, 729 F.2d 1158, 1160-61 (8th Cir. 1984).

[147] 48 F.3d 1 (1st Cir. 1995).

a bank robber captured in surveillance photographs were admissible because those witnesses were intimately familiar with the suspect's appearance. In that case, the surveillance photographs were somewhat blurred and only showed half of the robber's face. Under those circumstances, the First Circuit held that the district court properly admitted the testimony of three witnesses who knew the defendant well and "had seen him on multiple occasions under a variety of circumstances."[148] The witnesses' identification testimony was helpful because they knew the defendant's appearance well and the surveillance photographs were unclear.[149] As the First Circuit explained, the lay identification testimony was admissible because "the witness[es] possesse[d] sufficiently relevant familiarity with the defendant *that the jury [could not] also possess*."[150] "[W]hen the photographs are not either

---

[148] *Id.* at 5.

[149] *Id.* at 5-6; *see also United States v. White*, 639 F.3d 331, 336 (7th Cir. 2011) (holding that a defendant's sister and girlfriend could opine on the defendant's appearance, when surveillance footage of the crime was of poor quality, the perpetrator was wearing a bulky winter coat and pulled-down hat, and the defendant argued that the man captured in the surveillance video was really his uncle. Because both women knew the defendant and his uncle, "they were able to provide the jury with helpful insight regarding the true identity of the man shown in the surveillance video and counter [the defendant's] claim that the still photograph really depicted [his uncle]."); *United States v. Borrelli*, 621 F.2d 1092, 1095 (10th Cir. 1980) ("Since Borrelli lived with his stepfather for five years and had moved only a few days prior to the robbery, his stepfather had independent knowledge of Borrelli's appearance both before and at the time of the robbery. . . . In the seven months between the robbery and trial, Borrelli had significantly altered his appearance . . . . Because Borrelli's stepfather was in a much better position than the jury to give an opinion as to the resemblance between Borrelli at the approximate date of the robbery and the man in the surveillance photograph, this is an instance where the opinion testimony was helpful to the jury in the determination of a fact in issue.").

[150] *Jackman*, 48 F.3d at 5-6.

so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification,"[151] lay witness testimony is admissible.

Neither Scartozzi nor Gomez had sufficient familiarity with the appearances of Barnes or Fulton to assist the jury here. Neither testified to any familiarity with Barnes or Fulton apart from this case. Gomez's in-person interactions with Fulton and Barnes were very limited and he did not interview Barnes until nearly two months after the robbery.[152] Accordingly, he could not claim any familiarity with Barnes at the time of the robbery. Scartozzi's familiarity with Barnes and Fulton was even more attenuated. He did not meet Barnes until January 18, 2014, after Fulton's trial began.[153] These minimal relations provided neither Scartozzi nor Gomez with familiarity with the defendant's appearance at the time the crime was committed, the defendant's customary manner of dress, or the defendant in a variety of circumstances. Accordingly, their opinion testimony was not helpful within the meaning of Rule 701(b). These agents were no better equipped than the jurors to compare the suspect's appearance with that of Barnes and Fulton. Testimony from lay witnesses whose exposure to suspects is "limited to three days in a sterile courtroom setting" is not helpful.[154] Scartozzi and

---

[151] *Id.* at 6; *see United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984) ("A witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.").

[152] J.A. 784 (Gomez).

[153] J.A. 902, 904.

[154] *United States v. Allen*, 787 F.2d 933, 936 (4th Cir. 1986), *vacated on other grounds,* 479 U.S. 1077 (1987); *see also United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993) (excluding opinion testimony from an investigating police officer identifying defendant in a surveillance photograph because defendant's appearance had not changed between time of robbery and trial and officer's testimony regarding the defendant's appearance "was based entirely on

Gomez's testimony performed exactly the function Rule 701 is designed to prevent. They assumed the role of juror in comparing photographs of Barnes and Fulton to the surveillance footage and concluding Fulton looked more like the robber than Barnes.

The government argues that it was entitled to present Scartozzi and Gomez's opinion testimony regarding the appearances of Fulton and Barnes to rebut defense testimony on this point.[155] At trial, Fulton asked Michael Calcaterra (Fulton's roommate) and Rosalyn Torres (Fulton's girlfriend at the time of the robbery) to review the surveillance images and opine on whether they depicted him. Both of those witnesses were intimately familiar with Fulton's appearance. Therefore, as just explained, their testimony was appropriate. Michael Calcaterra testified Fulton had a different appearance from that of the robber in the surveillance footage.[156] Michael Calcaterra explained that the robber appeared to be "chunkier,"[157] Fulton was a "little more defined,"[158] and Fulton's head was smaller.[159] Torres testified similarly.[160] In response, the government asked Gomez and Scartozzi to review the images and offer their opinions.[161]

But the government is not entitled to elicit improper lay opinion testimony to counter the defense's proper opinion evidence. As Fulton points out, the government's argument boils down to this: "because the defense elicited testimony from individuals with personal knowledge of Fulton that undermined the government's theory of the case, the government was entitled to respond with lay opinions from Gomez and Scartozzi, regardless of the requirements of Rule 701."[162] We know of no authority for the proposition that otherwise inadmissible evidence is admissible to rebut

---

his review of photographs of [the defendant] and witnesses' descriptions of him").

[155] Appellee's Br. at 15.

[156] J.A. 208-10, 211-12, J.A. 215-16.

[157] J.A. 209.

[158] *Id.*

[159] *Id.* at 215-26.

[160] J.A. 609-10.

[161] Appellee's Br. at 15.

[162] Appellant's Reply Br. at 9.

evidence that hurts a party's case. Rather, the government must show that Scartozzi and Gomez's testimony meets Rule 701's requirements. It cannot make such a showing.

The concurrence also contends that this testimony was proper because it was elicited for the purpose of explaining why the officers eliminated Barnes as a suspect. However, much of Gomez's crucial lay opinion testimony regarding Fulton's appearance and its similarity to the robber's was solicited as part of Gomez's initial testimony regarding who he thought the culprit was.[163] This testimony was solicited before the issue of Barnes was even introduced. Therefore, government presented opinion testimony that went beyond merely explaining the exclusion of Barnes as a suspect: This opinion testimony told the jury that the robber in the surveillance video looked like Fulton. Moreover, the district court never instructed the jury that the evidence should only be considered as background to explain why the investigation focused on Fulton.

Since the opinions of Scartozzi and Gomez were not helpful to the jury under Rule 701(b), we need not determine if they meet Rule 701's other requirements.

3.

Although the district court erred in admitting Scartozzi and Gomez's lay opinion testimony regarding the appearances of Barnes and Fulton, Fulton must once again establish that this mistake amounts to plain error to obtain relief. Here, the jury was able to view the surveillance photographs and compare them to the appearances of both Fulton and Barnes. Although the officers' interpretation of the evidence may well have influenced the jurors' assessment of the photos, the jury ultimately knew it was tasked with interpreting the exact same evidence as the officers. The jurors could rely on their own assessments of the photos, rather than those of Scartozzi and Gomez.

Moreover, Fulton's lay witnesses, Calcaterra and Torres, rebutted the officers' identification testimony. The jurors were free to give more weight to Calcaterra and Torres' testimony than that of Gomez and Scartozzi.

---

[163] J.A. 768-775.

Nevertheless, a note of caution is warranted. We do not doubt that jurors may well be inclined to attach special significance to the identification testimony of law enforcement officers. Jurors may assume that the officers' training places them in a unique position to draw comparisons and reach conclusions in evaluating evidence. Regrettably, this tendency may persist despite an instruction that tells jurors they are the ultimate finders of facts and must rely on their own assessment of the evidence.

Despite this vexing issue, we must assess the impact of the error in context with all of the evidence of Fulton's guilt. Because the other evidence is not insignificant, we find that this error survives the harmless error inquiry. Fulton's telephone call to Echevarria in which he acknowledged awareness of the bank robbery that had just occurred is particularly damning. Absent this and the other evidence tying Fulton to the robbery, it would be very difficult to conclude that these erroneous evidentiary rulings were harmless.

C. *Expert Testimony*

Fulton also argues for the first time on appeal that Gomez's testimony regarding the suspect's height based on Gomez's estimation of the elevation of the bank counters was improper expert testimony. Accordingly, he contends that this testimony should have been elicited, if at all, from an expert after a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[164]

> We disagree. As we have explained,
> The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be

---

[164] 509 U.S. 579 (1993).

described factually in words apart from inferences.[165]

"[L]ay testimony is improper where it encompasses opinions that call for specialized skill or expertise—such as a paramedic's testimony that skull trauma caused the bruises on a victim's face."[166] Nevertheless, we have also clarified that this does

> not mean that an expert is always necessary whenever the testimony is of a specialized or technical nature. When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.[167]

Therefore, as long as the technical components of the testimony are based on the lay witness's personal knowledge, such testimony is usually permissible.

Gomez banked at the branch office that was robbed and was personally familiar with the height of the counters.[168] His personal knowledge afforded him a reference point to opine on the stature of the suspect. This fits squarely within the definition of lay witness testimony. Fulton claims that Gomez's testimony relied on a technique called "reverse projection photogrammetry"[169] to determine the suspect's height, but this claim is a real reach. Gomez did not measure the height of the counters and then calculate the suspect's height based on that measurement. Instead, he merely

---

[165] *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995) (citing Mason Ladd, *Expert Testimony*, 5 Vand. L. Rev. 414, 417 (1952)).

[166] *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (internal quotation marks and alterations omitted).

[167] *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009).

[168] J.A. 769.

[169] Appellant's Br. at 33.

described the suspect's height in reference to a landmark with which he was personally familiar. That is more akin to lay opinion testimony than expert testimony.

Moreover, even if we assume that Gomez's testimony was erroneously admitted expert testimony, this error would not have been "'clear or obvious, rather than subject to reasonable dispute.'"[170] Accordingly, assuming arguendo that this was error, it does not rise to the level of plain error. Fulton is thus not entitled to relief on the basis of the admission of that testimony.

## III.

Fulton also argues that the prosecution misstated the GPS evidence during closing arguments. He contends that this misstatement deprived him of a fair trial. Our inquiry is once again for plain error because Fulton did not object to the prosecution's statement at trial.[171] We conclude that the district court did not err.

## A.

At trial, Dr. Richard Fuller, an expert in the field of global navigation satellite systems, interpreted the GPS tracker's location data for the jury.[172] Dr. Fuller explained the GPS's pathway and the reliability of the data associated with this device. Most importantly, he explained Government Exhibit 534A,[173] which depicts where the GPS was located from 4:14:47 p.m. to 4:16:19 p.m.[174] The figure below recreates Government Exhibit 534A with labels for the different portions of the residence.

---

[170] *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).
[171] *See United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010); *see also United States v. Olano*, 507 U.S. 725, 731-32 (1993).
[172] Fuller actually helped invent the GPS device used in this case. J.A. 238-39 (Fuller).
[173] J.A. 1226.
[174] J.A. 1239.

**2-6 John Ave. with GPS Data (Government Exhibit 534A)**



This exhibit was rotated ninety degrees counter-clockwise when displayed at trial. In Government Exhibit 534A, Barnes' half of the residence appeared in the upper half of the image. At trial, Fuller first explained that the circles and ellipses above are error circles and ellipses, indicating "both

31

the confidence and statistical distribution of the [GPS] data."[175] As he explained,

> An error ellipse will take into account not just the overall accuracy of the data, but the error ellipse will also take into account the geometry, the precise geometry that's available from the satellites at a given time, so, it's a little bit more precise in general than the error circle, but both are meant to indicate same information, that you have a certain level of confidence where a particular device is at a given time. . . . It is meant to give you an indication of the confidence of the estimate of that point. . . . [T]he ellipse gives you an idea of how confident you are in that estimate. A larger ellipse means lower confidence. A smaller ellipse means higher confidence in the precision of that individual point.[176]

He then clarified that the color of the error ellipses corresponds to the strength of the GPS signal: "the higher the signal level, the higher your confidence in your position."[177] He clarified that green error ellipses (light grey in the figure above) represent the best signal conditions, blue are second best (dark grey in the figure above), and brown are third (none pictured in the figure above). He stated that, statistically, there is a "68 percent likelihood" that the GPS is within a given error ellipses, leaving "a 32 percent chance that it's outside the ellipses."[178]

Fuller matched the error ellipses derived from the GPS data with the location of roads and objects on Google Earth. They matched. In other words, the GPS data indicated that the device traveled on roads before reaching 2-6 John Avenue, lending creditability to the accuracy of the GPS data. He explained: "if there [were] offsets of the road data from the image data or the GPS data from either one of those two, it would call into question in my mind whether one or − one

---

[175] J.A. 258.

[176] *Id.* at 258-59.

[177] *Id.* at 284.

[178] *Id.* at 299.

part of that data is incorrect."[179] Here, however, "[t]he road overlays on the image data were on to a meter level roughly, and the positioning information on the places where [the GPS] was most easy to identify at early in the track were very correlated to both the road and image data."[180] This correlation between the imagery, the mapping data, and the GPS data gave Fuller a "significant level of trust in the three correlating, the three being correct as looking at the overall track [of the GPS]."[181]

Using Exhibit 534A, Fuller explained that the GPS moved from the road towards the house on the side closer to Barnes' part of the residence.[182] The earliest point of data near the house is labeled in Figure 2. The GPS then moved from the right to left half of the residence depicted in Figure 2. The part of Fuller's testimony that is critical to Fulton's argument on appeal reads as follows:

> **Question**: And so, am I correct that some of these error ellipses overlap the inside and the outside of the house?
>
> **Fuller**: Yes.
>
> **Question**: And some of them are fully contained within?
>
> **Fuller**: Yes.
>
> **Question**: And can you tell the jury what period of time this video covers?
>
> **Fuller**: This covers from 4:14:47 p.m. . . . till 4:16:19 p.m., . . . *so approximately a 90-second period*.
>
> **Question**: And have you reached any expert opinions to a reasonable degree of certainty in

---

[179] *Id.* at 267.

[180] *Id.*

[181] *Id.* at 268.

[182] J.A. 290.

33

your field about where the device was during this period of time?

**Fuller**: The device *is located at [2-6 John] during this period and it appeared -- it has a higher concentration of points in the southwest corner of [2 John] than any other place in the building*.

**Question**: Can you reach an expert opinion based on just one of these ellipses?

**Fuller**: It would be difficult based on a single point to make a determination of a definitive nature. The overlapping of these points and the combination of these points increases the confidence in the estimate that it's at this location. In essence, the probability increases as you get more of these overlapping one another.

**Question**: And where are the vast majority of the overlapping ellipses?

**Fuller**: *In the southwest corner of [2-6 John].*

**Question**: Have you reached an opinion as to whether or not the device was inside the building?

**Fuller**: The most logical place would purport to be *inside the building*. Two other alternates could exist. One, it was on top of the building, it was on the roof. The data does not necessarily confirm or rule that out, . . . or conceivably, since I'm not showing altitude here, it could be underneath the building as well.

Underneath the building is far less likely . . . . It just seems to make more sense to be inside the structure than on top of it from a -- from a time perspective, since we're only talking about a minute and a half, as well as just the physical access portion of it.

34

**Question**: So, just to clarify, Dr. Fuller, when you say outside, you're talking about literally on top?

**Fuller**: On top of the house, correct. On top of it as compared to inside the building.[183]

When questioned about his opinion that the "most logical place" for the GPS to have been was inside the house, Fuller explained that he based his opinion on the "preponderance of points overlapping one another directly inside the enclosure or the visual enclosure of this building, the area covered by that structure, as well as the confidence of the data level, the signal quality during this period of the track."[184] Fuller never described 2-6 John with reference to specific rooms. Instead, he used directional terms ("southwest corner") to describe the GPS's location. Again, Exhibit 534A depicted 2-6 John Avenue as follows:

| Back-yard | Barnes' Residence | | Road |
| | | | |
| | Fulton's Room | Calcaterras' Room | |
| | Restroom | Living Room | |
| | Kitchen | | |

To aid jurors in interpreting this location data, Lieutenant Gomez testified that Fulton's room was located

---

[183] *Id.* at 293-95 (emphasis added).
[184] *Id.* at 296-97.

exactly where the majority of the overlapping ellipses appeared. When shown Exhibit 534A, Gomez testified that Fulton's room was in "the back left corner of [2 John Avenue]."[185]

Fulton claims that Gomez's testimony was incorrect and misleading[186] because Fulton's room was located in what is more accurately described as the upper left hand corner of the lower half of 2-6 John. From the trial transcript it is difficult to tell whether Gomez's testimony was inaccurate. Generally speaking, Fulton's room is in the lower left hand corner. When Government Exhibit 534A is broken into 4 quadrants, Fulton's room is in the lower left hand quadrant.

During its summation, the government further relied on Fuller's testimony to argue that the GPS was in Fulton's bedroom for ninety seconds. More specifically, the prosecutor stated:

> the GPS tracking device was in the defendant's bedroom, inside the defendant's house for approximately 90 seconds, reporting every six to eight seconds. We heard Dr. Fuller tell us again and again and again right over the defendant's bedroom.[187]

And during rebuttal argument, the government repeated: "[Fuller's] analysis told him in his expert opinion, based on his 20 years in the field, that the device was in the defendant's bedroom. That is uncontradicted testimony."[188]

Fulton also argues that this testimony is incorrect. While Fulton is technically right that Fuller never testified that the GPS was in his bedroom, Fuller did testify that the "most logical place" for the GPS to have been was the southwest corner of 2-6 John. As Government Exhibit 534A demonstrated, this area included Fulton's bedroom. Therefore, the prosecutor's argument was, at worst, a slight mischaracterization of Fuller's testimony. However, it was a fair inference based on that testimony.

---

[185] *Id.* at 776.

[186] Appellant's Br. at 38.

[187] J.A. 1110.

[188] *Id.* at 1155.

B.

Fulton argues that the district court plainly erred in failing to strike the government's characterization of Fuller's testimony about the location of the GPS in closing. We disagree. It is fundamental that counsel may "argue reasonable inferences from the evidence," but may not "misstate evidence."[189] A prosecutor's misstatement of the evidence can "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'"[190] To determine whether a prosecutor's comments deprived a defendant of a fair trial requiring reversal, an appellate court must consider the "offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."[191] Furthermore, where the appellant did not object to the contested statements at trial, as is the case here, our standard of review is even more deferential. Therefore, even if Fulton can show that a legal error occurred, he must also show that this error was plain or

---

[189] *United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001); *see also United States v. Watson*, 171 F.3d 695, 699 (D.C. Cir. 1999) ("It is error for counsel to make statements in closing argument unsupported by evidence, to misstate admitted evidence, or to misquote a witness' testimony.").

[190] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *see United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992) ("[A] single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." (internal quotation marks omitted)).

[191] *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001); *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (in assessing the prejudice of a prosecutor's improper comments during closing argument, this Court considers "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction").

obvious,[192] and affected "the fairness, integrity or public reputation of judicial proceedings."[193] As we have explained, "'In order to demonstrate prosecutorial misconduct under a plain error standard, the review must reveal egregious error or a manifest miscarriage of justice.'"[194]

Fulton argues that the government made three errors in closing: First, as just discussed, he contends that the government erroneously stated that the GPS was in Fulton's bedroom for ninety seconds. In reality, the device was *fully inside* the residence for sixty seconds—during the other thirty seconds, the GPS was transported from outside the house to inside. Next, Fulton argues that the government mistakenly stated that Fuller testified the GPS was in Fulton's room. We have already explained that Fuller actually testified that the GPS was most likely in the general area where Fulton's bedroom, the kitchen, and bathroom were located. Finally, Fulton contends that the prosecution misrepresented the precision of the GPS data to the jury. According to Fulton, a more accurate restatement of Fuller's testimony would be "the device was, (1) for approximately one minute, (2) in the southwest portion of the building, with the understanding that (3) there was a 32% chance that it was not in any given 'error ellipse,' that (4) the data could not tell whether it was inside, underneath, or on top of the building, and that (5) because it was moving either very slowly or not at all during that time, uncertainty about the device's position was increased."[195] Fulton contends that, collectively, these errors deprived him of a fair trial.

In support of this position, Fulton first cites *United States v. Watson*.[196] There, the court of appeals for the D.C. Circuit held a prosecutor's misstatements were sufficiently prejudicial to warrant a new trial. The critical issue in *Watson* was whether the defendant, Watson, had a connection to

---

[192] *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

[193] *Id.*

[194] *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003) (quoting *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001) (internal quotations marks omitted)).

[195] Appellant's Br. at 41.

[196] 171 F.3d 695 (D.C. Cir. 1999).

drugs found in a car.[197] Watson did not own the car, and no witness or fingerprint evidence placed him in the car.[198] To establish a connection between Watson and the car, the government relied on (1) a key to the car that the police found on Watson when he was arrested, (2) a bag from a store that was found in the car and contained crack, and (3) a receipt from that store found in Watson's home.[199] Defense witnesses, however, testified that Watson was in church for the part of the evening in question and disputed police testimony that Watson had the car key when he was arrested.[200] Defense witnesses connected another man, Hawkins, to the car and the key at the relevant time.[201]

In an attempt to strengthen Watson's connection to the car, the government tried to establish that the car's registered owner, Tyra Jackson, was Watson's girlfriend.[202] In doing so, however, the prosecution asked a witness (Mr. Thomas) a compound question which (1) assumed a fact not in evidence, *i.e.,* that Jackson was Watson's girlfriend, and (2) made the witness's response ambiguous: "Mr. Thomas, you believe that you know Watson's girlfriend, Tyra Jackson, right?" To which Thomas replied: "I never testified I knew her or not."[203] The prosecutor then asked, "You believe that you may have met her once or twice, right?" Thomas's response: "Maybe."[204] In closing, the prosecutor purported to quote Thomas and told the jury that Jackson was Watson's girlfriend, therein establishing a stronger connection between Watson and the car than the disputed evidence of the key and the store receipt.[205] The prosecutor repeated the point during rebuttal argument. Despite this material misstatement of the evidence, the district court provided only the "standard

---

[197] *Id.* at 697.

[198] *Id.*

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] *Id.* at 697, 698-99.

[203] *Id.* at 699.

[204] *Id.*

[205] *Id.*

instructions that counsel's questions, statements, and arguments are not evidence."[206]

On appeal, the court held that the statements clearly misstated the evidence and these misstatements prejudiced the defendant.[207] "[T]he case was close, and credibility was key."[208] In so holding, the court applied a three-factor test considering "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error."[209] The court also clarified that, unlike in our circuit, "this test applies regardless of whether our review is for harmless error or plain error."[210] The court then concluded that the error warranted reversal because: witnesses offered different versions of key events, the other evidence linking Watson to the car was weak, and the testimony at issue pertained to a critical issue—whether Watson had a connection to the car.[211] The court also held that the district court's standard jury instructions explaining that counsel's questions and arguments were not evidence were insufficient to mitigate the prejudice.[212] There, the trial court's error "went to the heart of the government's case on a matter with respect to which the government had no other weighty evidence." Thus, the defendant had "demonstrated substantial prejudice warranting a new trial."[213]

Fulton also relies upon our decision in *United States v. Mastrangelo*.[214] There, the government charged the defendant with conspiracy to manufacture methamphetamine. The parties stipulated that the defendant "had the chemical

---

[206] *Id.*

[207] *Id.* at 700.

[208] *Id.*

[209] *Id.* (noting the test for prejudice has also been framed "'in terms of the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks'" (quoting *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998) (internal quotation marks omitted))).

[210] *Id.*

[211] *Id.* at 700-01.

[212] *Id.* at 701-02.

[213] *Id.* at 702.

[214] 172 F.3d 288, 295-98 (3d Cir. 1999).

background to know the ingredients and equipment necessary to make methamphetamine."[215] But the defendant denied knowing how to make the drug, and the government did not present evidence proving this fact. Nevertheless, in closing argument, the prosecutor erroneously stated that the defendant knew how to make the drug: the defendant "had the knowledge, *the knowledge to either make it—make the methamphetamine* or to tell someone else how to make it."[216] The prosecutor repeated this statement multiple times. Based on these misstatements, the defense moved for a mistrial. But the district court denied the motion.

Instead, the trial court gave the following jury instruction:

> The parties stipulated that the *defendant had the chemical background to make methamphetamine.* The Government, [] in its closing made reference to the fact [that] there was no evidence presented that anyone else had this chemical background and that therefore by inference *the defendant, since he possessed this knowledge, must necessarily have been the maker.* Such an inference is improper and should be stricken from your minds. There was no burden on the defense to produce evidence that no one else did or did not possess chemical knowledge to make methamphetamine. Furthermore, there is no evidence in this case that no one else did not have the knowledge to make methamphetamine.[217]

However, we recognized that the district court's curative instruction *misstated* the stipulation. It repeated the prosecutor's mistakes, therein compounding the error ("The

---

[215] *Id.* at 294.

[216] *Id.* at 296 (emphasis in original, internal quotation marks omitted).

[217] *Id.* (emphasis in original, internal quotation marks omitted).

parties stipulated that the *defendant had the chemical background to make methamphetamine.*").[218]

   We concluded that the "impropriety of these statements is evident."[219]

> They distort the substance of the Stipulation, inflating the limited stipulation that Mastrangelo had the chemical background to know the ingredients and equipment necessary to make methamphetamine to encompass a meaning that the District Court had previously ruled unwarranted, i.e., that because of his knowledge of the ingredients and equipment needed, Mastrangelo knew how to make methamphetamine.[220]

We further noted that although "[a]rguably, a clear and forceful curative instruction from the District Court might have cured the potentially devastating effect of the prosecutor's misrepresentations," the district court's own misstatement of the stipulation "if it did not further confuse the jury, certainly did not effect a cure."[221]

   We therefore found clear error and focused on whether the error was prejudicial. We looked at familiar factors: "the scope of the improper comments in the overall trial context, the effect of any curative instructions given, and the strength of the evidence against the defendant."[222] We found the repeated misrepresentations "central," the attempted curative instruction faulty, and the other evidence less than overwhelming.[223] Accordingly, we concluded that the errors

---

[218] *Id.* (emphasis in original).

[219] *Id.*

[220] *Id.* Common sense illustrates how egregious the error in *Mastrangelo* was. The fact that someone knows that $H_2O$ is the chemical composition of water does not establish that she knows how to combine hydrogen and oxygen in a laboratory to produce water.

[221] *Id.* at 298.

[222] *Id.* at 297 (citing *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc)).

[223] *Id.* at 297-98.

pertaining to the stipulation were not harmless and remanded for a new trial.[224]

Fulton relies on these two cases to argue that the government's statements regarding the GPS evidence were erroneous and prejudicial. Like *Watson* and *Mastrangelo*, this case turns on the contested evidence. Fulton argues that the government would not have had much of a case against him without the GPS evidence. The prosecution had no clear surveillance footage, eyewitness identifications, or physical evidence linking the GPS or money to Fulton. In addition, the defense raised a strong inference that someone else (Barnes) might be responsible for the crime. Defense counsel further offered testimony from witnesses intimately familiar with Fulton's appearance that Fulton did not look like the man in the security footage. Therefore, according to Fulton, the government's case came down to establishing where the GPS was immediately after the robbery.

The prosecutor first stated that the GPS device "was in the defendant's bedroom, inside the defendant's house for approximately 90 seconds."[225] The prosecutor then characterized Fuller's testimony as stating "again and again" that the GPS was "right over the defendant's bedroom."[226] Finally, in rebuttal, the prosecutor repeated that "[Fuller's] analysis told him in his expert opinion, based on his 20 years in the field, that the device was in the defendant's bedroom. That is uncontradicted testimony."[227]

As we have just explained, Fuller never stated that the GPS was in Fulton's room or "over" Fulton's bedroom verbatim. However, he did testify that the GPS appeared to be in the "southwest" corner of 2-6 John for about sixty seconds, and moving into or out of that portion of the house for an additional thirty seconds. This southwest corner includes Fulton's bedroom and his shared kitchen. Therefore, a perfectly accurate summation of Fuller's testimony would have been: "Fuller told us the GPS was inside a portion of [2-6 John] that contained Fulton's room and Fulton's kitchen for

---

[224] *Id.* at 298.

[225] J.A. 1110.

[226] *Id.*

[227] *Id.* at 1155.

60 seconds, and moving into or out of that portion of the house for an additional 30 seconds."

Nevertheless, we do not think it improper to infer from Fuller's testimony that the GPS was in the defendant's room.[228] The GPS data did indicate that the GPS was in, on top of, or below an area that included Fulton's room for approximately sixty seconds. Furthermore, Fuller testified that the GPS was most likely not below the house, and it seems improbable that it had been on top of the house. It was certainly reasonable to argue that the GPS was inside the house, likely in Fulton's room. The error here was that the prosecutor inaccurately ascribed precision to Fuller's testimony.

This error is not as significant as those in *Watson* and *Mastrangelo*. In *Watson*, the prosecution's error created a connection between the defendant and a key piece of evidence that was completely unsupported by the record. In *Mastrangelo*, the prosecution unfairly ascribed crucial knowledge to the defendants that was not supported by the evidence. Here, the prosecution's statement was a reasonable inference drawn from Fuller's testimony. A perfectly accurate summation of Fuller's testimony still inculpates Fulton. The statement "Dr. Fuller's analysis lead him to conclude, in his expert opinion, that the GPS was inside a portion of [2-6 John] compromised of Fulton's room and a kitchen Fulton shared," is not much weaker evidence of Fulton's guilt than the statement "[Dr. Fuller's] analysis concluded in his expert opinion . . . that the device was in the defendant's bedroom." Therefore, it is highly unlikely that the prosecution's misstatement altered the outcome of the trial.

---

[228] It is well-settled that the Government "'is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence.'" *United States v. Lee*, 612 F.3d 170, 194 (3d Cir. 2010) (quoting *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991)). The government "may 'ask the jury to draw permissible inferences from anything that appears in the record.'" *United States v. Sullivan*, 803 F.2d 87, 91 (3d Cir. 1986) (quoting *Oliver v. Zimmerman*, 720 F.2d 766, 770 (3d Cir. 1983)).

Similarly, the prosecution's statement that the GPS spent ninety seconds inside Fulton's room when, in reality, the GPS was only fully inside (over or under) that portion of the house for sixty seconds, and moving into or out of (over or under) the house for an additional thirty seconds is hardly prejudicial. In *Watson* and *Mastrangelo*, the absence of the prosecution's misstatement would have seriously weakened the government's case. Not so here. It is highly probative that the GPS was in Fulton's half of the house at all, whether for sixty seconds or ninety seconds.

Moreover, defense counsel was willing to rest on the court's general jury instruction that jurors must find the facts for themselves based upon their recollection of the evidence. Following the government's rebuttal summation, Fulton raised a concern about other portions of the government's argument, claiming that there was no evidence to support them.[229] Defense counsel clarified, however: "I'm not asking for a curative instruction, your Honor, because I am aware of the Court's standard instruction with regards to opening statements and closing statements."[230] Had Fulton objected, the court could have clarified that Fuller's testimony placed the GPS in the southwest portion of the residence, which undisputedly contained Fulton's bedroom.

Finally, to the extent that Fulton suggests the prosecution erred in stating that the GPS was in Fulton's room because the GPS data does not permit this type of location accuracy, it was incumbent on defense counsel to stress that limitation during his summation. Although litigants cannot misrepresent evidence, they are not required to affirmatively point out limitations in the scope of their evidence. Fulton was free to contradict the prosecution's argument that the GPS was in Fulton's room based on the data accuracy.

In assessing the prejudice of the prosecutor's comments during closing argument, we must consider "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting

---

[229] J.A. 1159-60.
[230] J.A. 1160.

the defendant's conviction."[231] The GPS evidence here was strong, even without the prosecution's slight mischaracterization. Indeed, it is not at all obvious that clarifying the limited scope of Fuller's testimony or offering more precise instructions regarding what Fuller actually said would have aided the defense at all. In fact, it may have only emphasized evidence that established the probability that the GPS had been taken to Fulton's portion of the residence. Accordingly, we conclude that no legal error occurred insofar as the prosecutor's summation is concerned. Moreover, even if an error did occur, it did not rise to the level required for us to find plain error.

## IV.

Finally, Fulton argues that the district court's errors, when combined, influenced the outcome of the trial. On a cumulative error challenge, a new trial is required "only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial."[232] Because Fulton did not raise this challenge before the district court, we review for plain error.

The district court erred in admitting Scartozzi's lay opinion testimony regarding whether Barnes was on the phone during the robbery. The court also erred in admitting Scartozzi and Gomez's lay opinion testimony regarding the comparative appearances of Fulton, Barnes, and the robber. But it is clear from our review of this record that these errors did not deprive Fulton of a fair trial. As we have explained, the jurors listened to testimony explaining that the call to Barnes' phone went to voicemail. Therefore, they were free to credit this testimony over that of Scartozzi. The jurors could also determine for themselves whether Fulton or Barnes looked more like the perpetrator captured in the surveillance footage. The evidence presented at trial was strong enough to prevent the case from turning on any propensity the jurors

---

[231] *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc).

[232] *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (internal alteration, quotation marks, and citation omitted).

may have had to unduly credit such testimony from law enforcement officers.

Furthermore, the testimony regarding the location of the GPS indicated that it spent time in, above, or below Fulton's half of the house for significantly more time than it was in, below, or above Barnes' half. Most damning of all, Fulton called his girlfriend's sister and mentioned the robbery immediately after the GPS was smashed and before police had arrived in his neighborhood. This call was very strong circumstantial evidence of Fulton's guilt. This evidence would not have been sufficient, by itself, to prove Fulton's guilt beyond a reasonable doubt. But when considered together with all of the other evidence in this case, that phone call pointed a very strong finger of guilt directly at Fulton.

Therefore, even without Scartozzi and Gomez's testimony on the Barnes' call and Fulton and Barnes' appearances, the government's case against Fulton was sufficient to establish guilt. Accordingly, reviewing the district court's decision for plain error, we hold that the cumulative effect of the district court's errors does not necessitate reversal.

Smith, J., *concurring*:

I concur in the judgment of the court and in the majority's analysis of every issue except its conclusion that portions of the lay opinion testimony of officers Gomez and Scartozzi were improperly admitted. The majority holds that much of the lay opinion testimony of both officers was improper because it was not helpful to the jury as required by Federal Rule of Evidence 701. I disagree and thus write separately on this issue.

Lay opinion testimony is admissible as long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. In *Asplundh Manufacturing Division v. Benton Harbor Engineering*, we held that "[t]he prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, . . . sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." 57 F.3d 1190, 1196 (3d Cir. 1995).

I believe the testimony elicited from both officers was *very* probative and helped the jury assess the quality and thoroughness of the officers' investigation in this case. This is a crucial issue given Fulton's argument at trial that the police bungled their investigation by too quickly ruling out other potential suspects. Fulton specifically suggested that his neighbor Mr. Barnes—a man of similar height and

1

(somewhat) similar stature—could have been the bank robber. In light of the GPS evidence presented in this case placing the tracker in the building where both men lived, this appears to have been Fulton's best defense. In response to this claim, the prosecution elicited testimony from the two officers who conducted the investigation to show—as the questioning made clear—why the elimination of Barnes as a suspect was based on sound police work and was certainly not "hasty."[1]

Indeed, we look no further than the beginning of the prosecution's key line of questioning, which begins with a very relevant query: "why did you [officer Scartozzi] eliminate [Barnes]" as a suspect? In response, Scartozzi explained that he eliminated Barnes because (1) "Ricardo Barnes did not match the physical descriptors of the bank robbery," (2) Barnes' phone data shows that he received a call at the exact time as the robbery, and (3) "Sprint PCMD data indicated that during the time of the bank robbery . . . [Barnes] was not near the bank," This testimony helped the jury determine whether Scartozzi's investigation of Barnes was sufficiently thorough.

The majority rejects this position and instead contends that this testimony did not just "shed light on the thoroughness" of the police investigation but instead "provided a definitive interpretation of a crucial disputed fact—whether Barnes could have committed the robbery." I fully acknowledge that when "the jury has before it the same

---

[1] Whether this was, in fact, a thorough investigation was a question left for the jury.

2

circumstantial evidence . . . on which a witness bases an opinion concerning a defendant's knowledge, testimony from a witness . . . [on that issue] usually will not meet Rule 701(b)'s helpfulness requirement," *United States v. Anderskow*, 88 F.3d 245, 250 (3d Cir. 1996), That, however, is not the case here.  The officers' testimony addressed an issue solely within the knowledge of the officers' themselves: how thorough was their investigation?  They alone could offer testimony as to the steps they took in ruling out Barnes as a suspect.

As we have explained on several occasions, the Federal Rules of Evidence suggest a "generally liberal approach to the admissibility of evidence." *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 167 (3d Cir. 1999); *see also Forrest v. Beloit Corp.*, 424 F.3d 344, 355 (3d Cir. 2005) ("Under the Federal Rules of Evidence, subject to certain limitations, all evidence is admissible if it is relevant.").  I thus believe that admission of this testimony better comports with both the general admissibility standards laid out in the federal rules and our long-held view that "[t]he modern trend favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980); *see also Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 600-01 (3d Cir. 1998) ("As long as the circumstances can be presented with greater clarity by stating an opinion, then that opinion is helpful to the trier of fact." (internal citations and quotation marks omitted)).

I similarly take issue with the majority's suggestion that the testimony here could have been admitted if Officer Scartozzi had stated that he discounted Barnes as a suspect because he *assumed* Barnes was on the phone based on the evidence he considered. This minor tweak seems to be of little legal significance as here it was certainly clear to the jury based on the testimony elicited—and indeed it was made crystal clear on cross-examination—that Scartozzi never physically saw Barnes talking on the phone at some other location while the robbery was taking place at the PNC Bank. Instead, the jury was made aware through his testimony that Scartozzi could only have assumed (or rather, *inferred*) that Barnes was on the phone during the robbery based on his review of the phone logs. Whether this was a proper inference was a contested issue for the jury to decide. I would thus have concluded that Scartozzi's statement: "Barnes was on the phone during the robbery" was sufficiently similar to (and really, mere shorthand for) the more precise statement: "my investigation led me to infer that Barnes was on the phone during the robbery," for us to conclude that the testimony given was appropriate.

Accordingly, I would have upheld the District Court's admission of the officers' lay opinion testimony. That said, I concur in the judgment.