# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-2156

UNITED STATES OF AMERICA

v.

JABAR EVANS,
also known as JB, also known as Hood,
Appellant

_____

Appeal from U. S. District Court, D.N.J.
Judge William J. Martini,
No. 2:21-cr-00899-001

Before: RESTREPO, MCKEE AND AMBRO, *Circuit Judges*
Argued Nov. 10, 2025;
Decided May 19, 2026
_____

OPINION OF THE COURT

RESTREPO, *CIRCUIT JUDGE*

Jabar Evans appeals his convictions for drug and firearm offenses that followed a search of his hotel room pursuant to a warrant. He alleges three trial court errors on appeal, none of which warrant relief. His claim that the District Court erred by admitting improper lay opinion testimony has merit, but any error was harmless in light of the evidence. For

the following reasons, we will affirm the judgments of sentence.

**I.**

**A.      Facts**

On April 23, 2021, Evans checked into Room 306 of the Haiban Inn Hotel in Jersey City, New Jersey.  Two months later, on June 21, 2021, Evans asked the hotel manager for a larger room and was given Room 207.  That night, Evans and his friends moved his belongings into the larger room.  Evans returned the keys for Room 306 to the hotel manager the next morning.

The hotel's housekeeping staff cleaned Room 306 later that day.  A plastic bag containing two handguns and some letters with distinctive handwriting was found inside the room's open safe.  A housekeeper brought the bag to the hotel manager, who then called the police to report the guns.  Patrol officers responded and collected the guns—a .45 handgun loaded with hollow point bullets and a 9 mm handgun with a defaced serial number and a missing magazine.  The manager gave the officers a copy of Evans' driver's license and told them that Evans was there in his new hotel room.  From Evans' identification, police determined that there was an outstanding warrant for his arrest.

On the night of June 22, 2021, officers from the Jersey City Police Department's Emergency Services Unit (ESU) assembled outside the door of Room 207.  Evans initially responded to an officer announcing their presence but became silent after they identified themselves as police.  While the officers were attempting to persuade Evans to come to the door, Evans leaned out of the window and made eye contact with the officer positioned outside.  After forty minutes of no response from Evans, the officers forced entry into the room.  They found Evans on his bed and arrested him without incident.

2

Because Evans was recovering from a prior gunshot wound, the officers took him to the hospital for treatment.

Meanwhile, Jersey City detectives obtained a warrant to search Room 207 for further evidence of weapons offenses, such as the missing magazine from the confiscated gun or "identifiers" that would link any firearms or firearm accessories to the resident of the room. Appx. 3. The warrant was executed in the early morning hours of June 23, 2021. Upon entering the room, the officers immediately found a small shoebox filled with bundled heroin. Nearby was a garbage bag filled with bundled heroin and boxes of empty glassine bags. Throughout the room were stamped glassine bags that contained controlled drug substances. Also recovered from the room were stamp pads and various stamps, as well as drug packaging materials covered in a white powdery residue: a mirror, scales, measuring cups, small scoops, a press, a grinder, a pestle, a strainer, and substances used to augment or "cut" different narcotics.

During the search, a detective noticed a piece of tile from the room's drop ceiling on the bed. Standing on the bed, the detective pushed on the broken tile and a gun magazine fell from the ceiling. From that position, he was able to pull down two duffel bags and a backpack. The backpack contained different types of drugs—crystal methamphetamine, cocaine, crack cocaine, codeine, fentanyl and heroin—and approximately $8,000 in cash. One of the duffel bags, which Evans was seen on surveillance footage carrying from Room 306 to Room 207, contained fentanyl, bundled glassine bags and other drug packaging materials. Also in the duffel was a letter with the same distinctive handwriting as the letters found in the safe. The other duffel bag contained marijuana in different sized packaging, ranging from large Ziploc bags to glassine packets.

All told, the officers found approximately 13,000 glassine bags of controlled drug substances in the hotel room.

Some of the glassine bags were stamped with stamps found in the room, and some of the bags matched the bags of heroin found in Evans' possession on the night he was shot.[1]

## B.    Procedural History

A grand jury returned a three-count indictment against Evans, charging him with being a felon in possession of guns in violation of 18 U.S.C. § 922(g)(1); possessing with the intent to distribute fentanyl and methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and possessing a gun in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c).[2]

Among other pre-trial motions, Evans moved to suppress the evidence recovered from Room 207. The District Court denied the motion, ruling that the "warrant laid out sufficient facts to support a probable cause determination that evidence of unlawful possession of a weapon would be found in [R]oom 207, including identifying information of who might be the owner of the two firearms found in 306." Appx. 4. The Court further found that, even if the facts were insufficient to support probable cause, the officers acted "with objective good faith in obtaining the warrant and acted within its scope," and therefore the good-faith exception to the exclusionary rule would apply. *Id*.

---

[1] Evans was shot several times the night of April 23, 2021. The officer who responded to the scene of the shooting found approximately 200 stamped glassine bags of heroin next to Evans. In the search that followed his arrest, officers found both the stamp and glassine bags of heroin stamped with the same mark in his hotel room.

[2] At trial, a firearms expert testified that the two guns were manufactured outside of New Jersey. Their discovery in a New Jersey hotel room meant that each gun "traveled and affected interstate commerce." Appx. 578.

4

At trial, Detective William Costigan testified for the government as to his role in executing the search warrant in Room 207. After providing his experience and credentials, Costigan identified the different types of narcotics found, described how they were packaged, and explained how the items seized were connected to drug manufacturing. Evans objected, and then moved for a mistrial, on the ground that Costigan was improperly offered as a lay witness in violation of Federal Rule of Evidence 701(c). The District Court denied both the objection and the motion, finding that Costigan's testimony was "not scientific [nor] highly technical" and therefore did not constitute expert testimony. Appx. 423. Instead, the Court ruled that the detective's testimony was consistent with what a lay person would conclude upon seeing the seized evidence.

The jury found Evans guilty of all three charges.[3] The District Court sentenced him to 192 months' imprisonment followed by five years' supervised release. This appeal followed.[4]

---

[3] With respect to the charge for possessing with the intent to deliver fentanyl and methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), the jury found that Evans possessed 400 grams or more of fentanyl and 50 grams or more of methamphetamine.

[4] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291.

## II.

### A. The search of the ceiling and the seizure of contraband found therein was proper

Evans argues the seizure of evidence found by searching the ceiling above his hotel room violated his Fourth Amendment rights. We disagree.

The warrant authorized a search of Room 207 of the Haiban Inn Hotel for evidence of unlawful firearm possession. The accompanying affidavit requested authorization to search for "clothing, contraband, projectiles, shell casings, firearms, writings, papers, electronic devices, DNA, fingerprints, other items of evidentiary value and other instrumentalities" that would establish an unlawful firearm possession charge under New Jersey law. Appx. 22. In litigating the motion to suppress, Evans argued the ceiling went beyond the scope of the warrant. The District Court found no error and denied the motion. We now review that decision de novo. *United States v. Ramos*, 443 F.3d 304, 307 n.3 (3d Cir. 2006).

Assuming *arguendo* that Evans had a legitimate expectation of privacy in the ceiling, the search pursuant to the warrant was proper. "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). A "warrant encompasses the authority to search" all the parts of the premises where "the person who is the target of the search has access to or control over." *Torres v. United States*, 200 F.3d 179, 187 (3d Cir. 1999). Moreover, warrants are to be "read in a common sense, non-technical fashion." *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004). For example, a warrant to search for guns, or evidence tying the target of the search to the guns, authorizes law enforcement "to open closets, chests, drawers, and containers in which the weapon

6

might be found." *Ross*, 456 U.S. at 821. Judicial review of how a warrant was executed focuses on whether the search was reasonable. *Dalia v. United States*, 441 U.S. 238, 258 (1979); *see also United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant" (citation omitted)). Such reasonableness "must be determined by the particular facts of each case." *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991).

Given these particular facts, law enforcement acted reasonably in searching the ceiling. The detective looked above the ceiling tiles after realizing that Evans had likely done the same, as indicated by the piece of ceiling tile on the bed. A gun magazine fell out when the ceiling tile was pushed, establishing that the space contained the evidence sought. Evans had been in the room for forty minutes before the officers entered, giving him plenty of time to access areas beyond the room's drawers and closets. Searching the ceiling meant efficiently completing the search, and "[t]here is no indication that [the] intrusion went beyond what was necessary." *Dalia*, 441 U.S. at 258 n.20; *see, e.g., United States v. Weinbender*, 109 F.3d 1327, 1329–30 (8th Cir. 1997) (holding that officers acted reasonably by removing drywall that looked to have been recently repaired to find hidden contraband); *Becker*, 929 F.2d at 446–47 (concluding that officers acted reasonably by jackhammering a concrete slab that appeared to have been recently installed to find drug-making materials).

Because the officers' actions were reasonable under the circumstances, there was no Fourth Amendment violation. *United States v. Stiver*, 9 F.3d 298, 302 (3d Cir. 1993). The incriminating nature of the drugs and drug packaging materials found inside the bags taken from the ceiling was immediately apparent and justified their lawful seizure. *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136 (1990)). For these reasons, we

will affirm the District Court's denial of the motion to suppress.[5]

## B.     Admittance of improper lay opinion testimony was harmless error

Next, Evans re-argues on appeal that the District Court abused its discretion by admitting lay opinion testimony in violation of Federal Rule of Evidence 701. He claims Detective Costigan improperly offered expert testimony as to how drug dealers operate, which went beyond his personal observations of the evidence and required expert knowledge. Whether the District Court abused its discretion in this instance is a close call. After close review, we conclude that aspects of the detective's testimony went beyond the scope of Rule 701 and should not have been admitted as lay opinion testimony, but that any error was harmless given the overwhelming evidence of Evans' guilt.

Detective Costigan was part of the team that searched Evans' hotel room and therefore personally observed the evidence that was seized. He testified that he had been employed by the Jersey City Police Department for eighteen years and had, in that time, handled "[o]ver a thousand" drug cases and received additional training in drug trafficking crimes. Appx. 352. As a result of this experience, he stated that he was familiar "with how illegal drugs are packaged for distribution." Appx. 353. During the course of his testimony, Costigan explained that drug trafficking is a "cash business,"

---

[5] Evans supports his Fourth Amendment claim by citing *United States v. Irizarry*, 673 F.2d 554 (1st Cir. 1982), which addressed a warrantless "security check" search of a hotel room. The *Irizarry* Court held that seizing the evidence from the hotel room's ceiling violated the Fourth Amendment because the officer "launched himself on an exploratory search" that was "not justified by any exigent circumstances." *Id.* at 559. Here, in contrast, there was a lawfully executed warrant that authorized the search of the ceiling.

and that guns are used by dealers to protect their cash proceeds. Appx. 355-56. He described the drugs and drug packaging materials found in the room, opining that traffickers use stamps to brand drugs for sale and that it was uncommon for street-level dealers to possess such "branding paraphernalia." Appx. 374. Costigan described the process of pressing narcotics to package them for sale and how drug manufacturers dilute the product to create more supply. He explained how the items seized would be used to manufacture drugs, and why the bundles of cash found in the room indicated drug trafficking rather than individual sales. Costigan provided terms used to describe different types and quantities of drugs, and confirmed that everything one "would need to manufacture and package narcotics" was found in the hotel room. Appx. 414.

After Costigan testified, Evans moved for a mistrial on the grounds of improperly admitted expert testimony. The government countered that Costigan did not offer expert opinions but only explained to the jury "why items were seized pursuant to this investigation." Appx. 417. The District Court denied Evans' motion, finding that Costigan had personal knowledge of "drug distribution" and "drug manufacturing," and that his testimony was consistent with what a lay person would conclude seeing the items seized. Appx. 431. The District Court also noted that Evans' defense was that the items belonged to someone else, and that strategy was not affected by Detective Costigan's testimony.

We review the District Court's evidentiary ruling that Detective Costigan's opinions were admissible under Rule 701 for abuse of discretion. *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 80 (3d Cir. 2009). Even if we conclude the District Court's ruling constituted error, we will reverse Evans' convictions only if the error was prejudicial and not harmless. *Id.* (citing *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 205 (3d Cir. 2000)).

9

The admissibility of non-expert opinion testimony is governed by Rule 701, which reads:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Rule 701's first requirement, that the opinion be "rationally based on the witness' perception," requires that the witness "have firsthand knowledge of the factual predicates that form the basis for the opinion." *Gov't of V. I. v. Knight*, 989 F.2d 619, 629 (3d Cir. 1993) (citing Fed. R. Evid. 701(a)). The personal perception requirement ensures that the lay opinion is based on the witness's own exposure to the facts, and that the witness's logical inferences are based on that exposure. *See United States v. Allen*, 10 F.3d 405, 414 (7th Cir. 1993); *see also* 29 Wright & Miller's *Fed. Prac. & Proc. Evid.* § 6254 at 152 (2d ed. 2026) ("[T]he quality and quantity of the perception must be sufficient to logically permit the witness to base an opinion thereon."). We have allowed professionals with specialized training in the relevant field to testify as lay witnesses and give opinions based on their personal knowledge of the evidence. *United States v. DeMuro*, 677 F.3d 550, 561–62 (3d Cir. 2012).

The second requirement demands that the lay opinion help the fact-finder understand testimony or determine a fact in issue. Fed. R. Evid. 701(b). To be helpful, the witness must "have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion" expressed. *Asplundh Mfg. Div. v. Benton Harbor Eng'g.*, 57 F.3d 1190, 1201 (3d Cir. 1995); *see also United States v. Savage*, 970 F.3d

10

217, 286 (3d Cir. 2020) ("In the time since Congress amended Rule 701, we have repeatedly affirmed our holding in *Asplundh* that the reliability of lay opinion testimony should be assessed in light of the witness's relevant and specialized knowledge and experience.").  The witness must offer an opinion that "aids or clarifies an issue that the jury *would not otherwise be as competent to understand*."  *United States v. Fulton*, 837 F.3d 281, 297 (3d Cir. 2016) (quoting *Lauria v. Nat'l RR Passenger Corp.*, 145 F.3d 593, 600 (3d Cir. 1998)).  Lay opinions that simply interpret facts the jury is equally qualified to understand "usurp the fact-finding function of the jury" and should be deemed inadmissible.  *Id.* at 292 (quoting *United States v. Garcia*, 413 F.3d 201, 210-11 (2d Cir. 2005)); *see also United States v. Diaz*, 951 F.3d 148, 156 (3d Cir. 2020) (noting that lay opinions should "offer[] insight the jury could not itself have gleaned from the evidence" rather than "provide the conclusion the government wanted the jury to reach").

Finally, subsection 701(c), added in 2000, requires that lay opinion testimony not be based on knowledge held only by experts.  Whereas a lay opinion may be premised on specialized knowledge or experience, an expert opinion demands additional qualifications that ensure a higher level of reliability.  Rather than testify to reasoning "which can be mastered only by specialists in the field," lay opinions must "result[] from a process of reasoning familiar in everyday life."  Fed. R. Evid. 701 advisory committee's notes to 2000 amendment (internal quotations omitted).  Subsection 701(c)'s requirements are meant to prevent a party from "conferring an aura of expertise" on a lay witness without meeting Rule 702's requirements for expert testimony.  *Donlin*, 581 F.3d at 81 (quoting *Garcia*, 413 F.3d at 215).  At bottom, if a lay witness offers an opinion based on information outside of what they perceived and reasoning beyond their level of qualification under the Federal Rules of Evidence, the testimony should not be admitted under Rule 701.

Drawing a distinction between expert and lay opinions is not always a straightforward task. Generally, we defer to the District Court's discretion, acknowledging that both lay and expert opinions may be based on the witness's firsthand observations and professional experience. This Circuit has long held that knowledge gained from work experiences can foster permissible lay opinions that are technical or specialized in nature. *See, e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (ruling no abuse of discretion in admitting lay opinion testimony as to damages where knowledge was gleaned from witness's "participation in the day-to-day affairs of his business"); *see also Donlin*, 581 F.3d at 81 ("The Advisory Committee's notes to the 2000 amendment to Rule 701 specifically address *Lightning Lube* and note that its holding remains undisturbed by the amendment."). But a lay opinion based on knowledge gained through work experience is only admissible if the witness personally perceived the facts underlying the inferred opinion. *See, e.g., Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226 (3d Cir. 2008) (holding that president of a security company's lay opinion of hotel's security measures was inadmissible because it was not based on firsthand knowledge of that location); *Fulton*, 837 F.3d at 291 (recognizing that Rule 701 permits a lay witness "to give her opinion or interpretation of an event when she has some personal knowledge of that incident").

Here, Detective Costigan gained specialized knowledge of drug packaging and manufacturing through his experiences as a narcotics officer. He was therefore qualified to help the fact-finder interpret the evidence of drug trafficking found in Room 207, and the opinions premised on his personal observations of the items seized from the hotel room were admissible under Rule 701.[6] The government laid a foundation

---

[6] For example, Detective Costigan's observation of the stamps, stamp pads and stamped glassine baggies in Evans' hotel room underlay his opinion that the items indicated drug trafficking. His opinion that the items found covered in a white powdery

for the detective's familiarity with the items, both generally through his experience as a narcotics officer assigned to drug trafficking cases and specifically through his role as one of the officers that executed the search of Room 207. *See* Fed. R. Evid. 701 advisory committee's notes to 2000 amendment ("[C]ourts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substances is established. . . . Such testimony is not based on specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge."). It was therefore within the District Court's discretion to allow Costigan to offer his opinion, subjected to cross-examination, as to how the items seized were tied to drug trafficking.

However, Detective Costigan's testimony regarding drug traffickers' general practices, which was not tied to his perceptions of the underlying facts of this case, should have been deemed outside the scope of a lay opinion and inadmissible under Rule 701. Opinions where the detective "seem[ed] to infer the knowledge for his testimony" from facts or experiences not before the jury were improperly admitted. *United States v. Jackson*, 849 F.3d 540, 554 (3d Cir. 2017). These included the opinions arising from his "training and experience" and not the evidence—such as how traffickers generally process and package drugs for sale and why firearms are necessary to protect a trafficker's product and cash profits.

residue, which included a strainer, pestle, grinder, spoon, measuring cups and playing card, were used to manufacture and package drugs was inferred from his perception of the seized evidence. Similarly, his opinion that the chemical quinine is used as a "cutting agent" for heroin was guided by the officers' seizure of three bottles of the substance. Appx. 384. The detective's opinion that a liquid recovered from the room was promethazine, which he explained was an ingredient of the drug "Leen," was technical in nature but based on his seeing the substance in Room 207 and therefore constituted permissible lay opinion testimony. *Fulton*, 837 F.3d at 301.

13

Also improper was Costigan's opinion, offered without connection to the evidence, that the denomination of a seller's cash profits can indicate the level of drug distribution. Finally, the detective's opinion that everything one "would need to manufacture and package narcotics" was found in the hotel room fell beyond the scope of lay witness testimony. Appx. 414. He presented the jury with a conclusion about the evidence that necessarily drew on his general knowledge of drug dealing. Opinions that rely on experiences not associated with the facts of record constitute "argument by way of lay opinion testimony" and usurp the jury's role as fact-finder. *Diaz*, 951 F.3d at 158.[7]

Even though some of Detective Costigan's lay opinions were admitted in error, we conclude that the result of any error—considered alone or in the aggregate—was harmless. In reaching this conclusion, we "must be able to say that it is highly probable that the error did not contribute to the jury's judgment of conviction." *Knight*, 989 F.2d at 630 (citing *Gov't of the V.I. v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976)). Given the sheer amount of drugs, manufacturing tools and packaging

---

[7] In essence, this interpretation is in keeping with the Advisory Committee Notes from the amendment creating Rule 701(c), which was enacted to prevent a witness from "proffering an expert in lay witness clothing" in order to avoid civil and criminal rules of disclosure. By way of example, the Note draws a distinction between a lay opinion identifying a particular drug where a "foundation of familiarity" had been established based on the witness's use of that drug and an expert opinion describing how drugs are manufactured and distributed. Fed. R. Evid. 701 advisory committee's note to 2000 amendment (citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)) (concluding that police officer's opinion that defendant's behavior was that of an experienced trafficker constitutes expert testimony). Consistent with the Note's reasoning, we distinguish opinions based on specific pieces of evidence personally observed from those describing the usual practices of traffickers as a general matter.

14

materials found in Room 207, it is highly probable that Detective Costigan's improper opinions regarding the modus operandi of drug dealers did not contribute to the jury's decision to convict. Indeed, Evans barely disputed that the evidence was indicative of drug manufacturing and distribution. Rather, his defense at trial was that the evidence did not belong to him. During his closing, Evans all but conceded that Room 207 contained evidence of drug trafficking, arguing instead that there was no proof he himself distributed drugs despite "hav[ing] all of this laboratory equipment and drugs knowingly in the hotel room." Appx. 1103-04. In light of the record, we conclude Detective Costigan's impermissible opinions concerning general drug trafficking practices did not prejudice Evans at trial.[8] Under these circumstances, therefore, relief is not warranted.

## C. No abuse of discretion where Evans was not entitled to spoliation instruction

Lastly, Evans argues that the District Court erred in denying his request for a spoliation instruction regarding the absence of body camera footage of the hotel room search. He claims the lack of explanation for the footage's absence is

---

[8] In his reply brief, Evans argues that the District Court erred in allowing Detective Costigan to offer opinions that addressed elements of the crimes charged and "helped the jury" find him guilty. Reply Brief at 8. If the requirements of Rule 701 are met, and the opinion testimony is not offered to "dictate a certain conclusion," it is permissible to have lay opinion testimony address the elements of the crimes charged so as to help the jury decide the case. *Fulton*, 837 F.3d at 291. In fact, if the lay opinion is *not* helpful to the fact-finder, it should be deemed inadmissible. Evans is correct that the detective's testimony "regarding the operations of narcotics dealers" not tied to the evidence was improperly admitted under Rule 701. Reply Brief at 8. But we conclude that the evidence of drug trafficking recovered from his hotel room was such that it is highly improbable this improper lay opinion testimony contributed to the jury's findings of guilt.

evidence of bad faith. Evans asserts he suffered prejudice because the footage would have "either corroborated or refuted" the officers' testimony that the seized items were in plain view and in close propinquity to his other belongings. Brief for Appellant, 21. We review the District Court's decision not to give such an instruction for abuse of discretion. *United States v. Leahy*, 445 F.3d 634, 642 (3d Cir. 2006). Upon review, we conclude no abuse of discretion occurred.

"Spoliation occurs when evidence is destroyed or altered, or when a party fails to preserve evidence in instances where litigation is pending or reasonably foreseeable." *Bull v. United Parcel Serv., Inc.,* 665 F.3d 68, 73 (3d Cir. 2012) (citing *Micron Technology, Inc. v. Rambus Inc*., 645 F.3d 1311, 1320 (Fed. Cir. 2011)). When the destroyed, altered, or unpreserved evidence is "relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him." *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 334 (3d Cir. 1995). In such cases, the opposing party may request a spoliation instruction. Such an instruction permits the fact-finder to infer "that the destroyed evidence would have been unfavorable to the position of the offending party." *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 268 (3d Cir. 2017) (quoting *Schmid v Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)).

A spoliation instruction is only appropriate if certain requirements are met. First, it must be established "that the evidence in question [was] within the [offending] party's control." *Brewer*, 72 F.3d at 334. And second, "it must appear that there has been an actual suppression or withholding of the evidence." *Id*. An instruction is not warranted if there is no indication of intentional misconduct. "No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally

16

destroyed, or where the failure to produce it is otherwise properly accounted for." *Id.*

The District Court did not abuse its discretion in denying Evans' request for a spoliation instruction. Evans is correct there was no footage of the search introduced at trial, but he failed to establish the appearance of intentional suppression by the police.[9] He never attempted to ascertain whether such footage existed, much less whether the police purposefully concealed the footage to hide harmful evidence. Instead, Evans argued a spoliation instruction was appropriate because the footage was "inexplicably unavailable, missing, [or] destroyed negligently." Appx. 1127. In so arguing, he conceded there was a plausible non-nefarious explanation for the missing evidence. *See Brewer*, 72 F.3d at 334 (finding that the failure to produce evidence could have been due to many reasons unrelated to the lawsuit). Where, as here, there is no showing that the police had intentionally prevented the footage from becoming evidence, a spoliation instruction would have been inappropriate.

Further, Evans did not prove he was prejudiced by the footage's absence. He failed to allege the missing evidence would have had any apparent exculpatory value. Whether the officers found the evidence in plain view or close to his other belongings would have been, at most, potentially helpful to his defense. The unintentional absence of only potentially helpful evidence does not warrant an unfavorable inference against the

---

[9] Footage from Officer O'Neill Arroyo's body camera was introduced at trial and showed Evans' arrest in his hotel room. Footage from Officer Tyler Wendt's body camera was also introduced and showed Evans leaning out of his hotel window while the police were at his hotel room's door. As part of the defense, Evans played Officer Arroyo's body camera footage of his interview of the hotel's housekeeper. Regarding the search, Detective Costigan testified he was not wearing a body camera and did not know what the other officers did with their cameras' footage.

government.  *Bull*, 665 F.3d at 73–74.  Finally, Evans repeatedly communicated to the jury that the absence of footage of the search was suspicious, both indirectly through his cross-examination of Detective Costigan and directly during his closing argument.  That the jury nevertheless found him guilty does not substantiate his claim of court error.

\* \* \* \*

For these above-stated reasons, we will affirm the judgments of sentence below.

*Counsel for Appellant*

Blair R. Zwillman

Emma Enright        [Argued]
Klingeman Cerimele

*Counsel for Appellee(s)*

Jane M. Dattilo        [Argued]
Mark E. Coyne
Office of United States Attorney